Filed 5/20/22  P. v. Baca CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C092948 |
| Plaintiff and Respondent, | (Super. Ct. No. 01F07786) |
| v. | |
| PEDRO WILLIAM BACA, | |
| Defendant and Appellant. | |

On February 4, 2003, a jury found defendant Pedro William Baca guilty of first degree murder (Pen. Code, § 187, subd. (a); count one),[1] attempted murder (§ 664/187, subd. (a); count two), and assault with a deadly weapon (§ 245, subd. (a)(1); count three). The jury also determined that in the commission of the murder and attempted murder, defendant had committed certain enhancements, including that he had personally "used,

---

[1] Undesignated statutory references are to the Penal Code.

1

and intentionally discharged" a gun proximately causing both the death of the murder victim and the great bodily injury of the attempted murder victim (§ 12022.53, subd. (d)). We affirmed his convictions and judgment on appeal. (*People v. Baca* (Apr. 7, 2004, C043828) [nonpub. opn.] (*Baca*).)

This appeal concerns the trial court's August 31, 2020, denial of defendant's postjudgment petition for resentencing under section 1170.95, enacted as part of Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1015) (Senate Bill 1437). While this appeal was pending, the Governor approved Senate Bill No. 775 (2021-2022 Reg. Sess.) (Senate Bill 775). This legislation took effect on January 1, 2022, and amends section 1170.95 to permit certain persons convicted of attempted murder to seek relief. (Cal. Const., art. IV, § 8; Stats. 2021, ch. 551, § 2.)

Given this legislative change, we now must decide whether defendant is correct that the trial court erred in relying upon his record of conviction to deny his petition at the prima facie stage.[2] The People oppose defendant's claim of error, arguing the jury's true findings on the section 12022.53, subdivision (d) enhancements necessarily preclude defendant's ability to state a prima facie case for relief because they conclusively establish the jury did not rely on a natural and probable consequences theory. As we shall explain, we agree that the implications flowing from the jury's enhancement determinations preclude defendant's ability to state a prima facie case for relief. Accordingly, we will affirm the trial court's post-judgment order.

---

[2] We will not address defendant's remaining arguments that no longer speak to the appropriate outcome of this appeal in light of this change and successive developments in case law.

2

BACKGROUND

*The Underlying Murder and Attempted Murder*

We take the factual description of the events underlying defendant's convictions from our analysis finding sufficient corroboration of accomplice testimony as recounted in our previous unpublished appellate opinion. (*Baca*, *supra*, C043828.)

"After finishing work at his family's restaurant about 7:00 p.m., [Anthony] Garnica [the murder victim] and his coworker, [L.W.] [the assault victim], walked to a Quik Stop market, where they met another friend, [J.A.] Garnica's girlfriend, their son, and another child drove into the lot. Garnica gave his girlfriend money to buy alcohol. As she did what she was told, she encountered [J.M.], [Rocky] Gonzales [a codefendant], and defendant, one of whom spoke to her and thus provoked Garnica. He stated, " 'Shut up, she's mines [*sic*].' " [J.M.] retorted, " 'Who the fuck you telling to shut up?' " He also asked Garnica if he was a "scrap," a derogatory gang term referring to members of a Hispanic gang associated with Southern California. At some point, [J.M.] grabbed the beer bottle Garnica was holding. Eventually, [J.M.] apologized to Garnica for approaching his girlfriend and the two of them shook hands. Defendant did not appear to be involved in the argument.

"Gonzale[s], [J.M.], and defendant bought their beer and left, although there is conflicting testimony as to whether defendant rode in the cab or the bed of the truck or whether he left on foot. [J.M.] testified that he could not find defendant and they drove to defendant's house looking for him. All the witnesses agree that a few minutes later, Gonzale[s] and [J.M.] got into a fight with Garnica and [L.W.]. During the fight, someone shot Garnica and [L.W.]. [L.W.] testified he did not see the shooter, but he did not see defendant during the fight. [L.W.] recovered; Garnica did not. The cause of death was a distant-range gunshot wound to the lower back.

"[J.M.] testified that Garnica and [L.W.] jumped him, they exchanged blows, he heard a gunshot, and then he saw defendant walk around the corner with a black revolver in his hand.  Defendant, according to [J.M.], then shot at Garnica.[3]

"The prosecution stipulated the immunity agreement with [J.M.] had been withdrawn because he had not been truthful during the preliminary hearing.  Moreover, defense counsel exposed a series of lies [J.M.] told during the investigation and prosecution of the charges.  [J.M.] insisted he was not a member of a gang despite photographs showing him throwing gang signs with other gang members, his red attire, his friendship with known gang members, and his use of gang terminology.

"[J.A.] testified that the shooting occurred just a few minutes after the first altercation.  After everyone left, he spoke to the owner of the Quik Mart for four or five minutes and then drove down Franklin Boulevard.  He saw Garnica face down on the ground and drove to the restaurant to inform Garnica's parents.  He estimated that no more than three to six minutes elapsed between the time the victims left the store and the time he saw Garnica on the ground.

"Defendant had broken off his relationship with his girlfriend, [Je.M.], a day or two before the shooting.  Nevertheless, she visited him in prison about a hundred times.  She testified that she was unable to remember much of anything because she smoked a lot of marijuana every day.  During the investigation, she told a police officer that she spoke to defendant on the telephone six days after the shooting.  He tearfully told her that he wanted to hold her once more because he had done something wrong, and he was going to be gone for a long time.  The meaning of defendant's statement was hotly

---

**3** As we highlighted in our previous opinion, J.M. was "[d]efendant's lifelong friend" and "testified that he saw defendant shoot at the victim, Anthony Garnica." (*Baca, supra*, C043828.)  As the only witness to the shooting, J.M. was "subjected to a searing cross-examination, during which the defense exposed his motive to lie, his propensity to lie, and his history of lying." (*Ibid.*)

4

contested at trial. The prosecution argued the statement was a blatant admission of guilt; defendant shot Garnica and was on the run. The defense argued that defendant admitted not to the shooting of Garnica, but to shooting at an inhabited dwelling. At the time of the telephone conversation, [Je.M.] did not know about the homicide. She believed defendant had shot at a relative's house. But during the conversation, she repeatedly told defendant not to tell her what he had done wrong or why he would be gone for a long time.

"[Je.M.] also testified that defendant brought home a gun when they lived together. A .32-caliber cartridge was found beneath defendant's couch and the slug taken from Garnica's body was also a .32-caliber. Defendant's apartment was across the street from the shooting." (*Baca, supra*, C043828.)

As previously noted, and in pertinent part, the jury convicted defendant of first degree murder (§ 187, subd. (a); count one) and attempted murder (§ 664/187, subd. (a); count two) and found true the enhancement allegations that defendant had personally "used, and intentionally discharged" a gun proximately causing both the death of the murder victim and the great bodily injury of the attempted murder victim (§ 12022.53, subd. (d).) Thereafter, the trial court sentenced defendant to an aggregate prison term of nine years plus three consecutive terms of 25 years to life. We upheld that judgment on appeal. (*Baca, supra*, C043828.)

*The Section 1170.95 Petition for Resentencing*

Thereafter on January 24, 2020, defendant filed a form section 1170.95 petition checking the boxes necessary to request resentencing relief and attaching portions of the reporter's transcript as well as portions of the written jury instructions, to wit, the natural and probable consequences doctrine instruction (CALJIC No. 3.02). Defendant further submitted a letter requesting the judge file the petition and appoint counsel to represent him.

The trial court appointed counsel to represent defendant in his section 1170.95 petition and briefing regarding this request ensued, including the People's argument that defendant was ineligible for relief because the jury's finding on the section 12022.53, subdivision (d) enhancement established that he was the actual killer. In response to the People's arguments, defendant's attorney incorrectly asserted that defendant's jury was not instructed on the natural and probable consequence doctrine and asked the court to conduct a review in the spirit of *People v. Wende* (1979) 25 Cal.3d 436.

On August 31, 2020, the trial court issued a written ruling finding defendant ineligible for relief as a matter of law. This ruling acknowledged that while defendant's jury had not been instructed on felony murder, it had been "instructed on the natural-and-probable-consequences doctrine of accomplice liability pursuant to CALJIC No. 3.02 with regard to both murder and attempted murder; the target offenses specified in [CALJIC No.] 3.02 were disturbing the peace, assault with a firearm, assault, and assault with a deadly weapon."

Nevertheless, the trial court reasoned that the jury's true finding under section 12022.53, subdivision (d) "that defendant Baca himself had personally discharged the firearm that proximately caused Garnica's death and [L.W.]'s great bodily injury" indicated that "the jury had apparently found that defendant Baca was the actual shooter. As such, it would not have utilized the natural-and-probable-consequences doctrine to convict defendant Baca of either the murder or attempted murder. This is evident, because—had the jury utilized the natural-and-probable-consequences doctrine—it would have found true only the vicarious-liability enhancements under Penal Code section 12022.53 [subdivisions] (d) [and] (e)(1), and not the separate actual-shooter enhancements under Penal Code section 12022.53 [subdivision] (d)."

The trial court continued that while defendant maintained he was not the actual shooter, the Third District Court of Appeal decision had found sufficient evidence to support the jury's determination otherwise, specifically that sufficient evidence

6

corroborated accomplice J.M.'s testimony that he saw defendant shoot at the murder victim. "Therefore it is beyond a reasonable doubt to this court that the evidence was sufficient to support defendant Baca's murder conviction and attempted-murder conviction based on a theory that defendant Baca was the actual shooter of both victims, directly causing the murder-victim's death and the attempted-murder-victim's great bodily injury." Accordingly, the trial court determined defendant's section 1170.95 petition failed because he could not establish that he could not now be convicted of murder because of statutory changes to sections 188 and 189. (§ 1170.95, subd. (a)(3).) On the contrary, "[b]ased on the jury's verdicts and findings, it is beyond a reasonable doubt to this court that the jury found defendant Baca guilty of first-degree murder as well as attempted murder without reliance on the natural-and-probable doctrine." In light of this determination, the court found it unnecessary to analyze whether section 1170.95 might apply to attempted murder. Defendant timely appealed.

## DISCUSSION

In 2018, the Legislature enacted Senate Bill 1437 (2017-2018 Reg. Sess.) which, with only one exception not relevant here,[4] amended section 188 to require proof of personal malice aforethought in all murder convictions. (§ 188, subd. (a)(3), as amended by Stats. 2018, ch. 1015, § 2.) "The effect of the new law was to eliminate liability for murder under the natural and probable consequences doctrine." (*People v. Offley* (2020) 48 Cal.App.5th 588, 594 *(Offley)* ; see also *People v. Gentile* (2020) 10 Cal.5th 830, 838-839 *(Gentile)* [case law and Senate Bill 1437 have eliminated the natural and probable consequence's applicability to murder in the first and second degree].) The legislation also enacted section 1170.95, which provides a mechanism allowing a petitioner to request vacatur of a murder conviction where that petitioner could not have been

---

[4] The exception applies in cases prosecuted under the felony-murder rule. (§§ 188, subd. (a)(3), 189, subd. (e).)

7

convicted of murder under the new law. It further provides for resentencing of those petitioners who were so convicted. (Stats. 2018, ch. 1015, § 4; *Gentile*, at p. 843.)

Prior to Senate Bill 775, appellate courts unanimously held section 1170.95 inapplicable to final convictions for attempted murder. (See, e.g., *People v. Dennis* (2020) 47 Cal.App.5th 838, 844-847, review granted July 29, 2020, S262184; *People v. Lopez* (2019) 38 Cal.App.5th 1087, 1103-1105, review granted Nov. 13, 2019, S258175; *People v. Munoz* (2019) 39 Cal.App.5th 738, 754-756). However, Senate Bill 775 amended subdivision (a) of section 1170.95 to read, in pertinent part: "A person convicted of . . . attempted murder under the natural and probable consequences doctrine . . . may file a petition with the court that sentenced the petitioner to have the petitioner's . . . attempted murder . . . conviction vacated and to be resentenced on any remaining counts . . . ." (Stats. 2021, ch. 551, § 2.) Thus, certain petitioners convicted of attempted murder are now eligible to seek relief under section 1170.95.

Section 1170.95, subdivisions (b) and (c) create a two-step process for evaluating a petitioner's eligibility for relief. (*People v. Lewis* (2021) 11 Cal.5th 952, 960-962 (*Lewis*).) First, the trial court determines whether the petition is facially sufficient under section 1170.95, subdivision (b). (*Lewis*, at p. 960.) If the petition is facially sufficient, then the trial court moves on to subdivision (c), appointing counsel (if requested) and following the briefing schedule set out in the statute. (*Id*. at p. 966.) Following the completion of this briefing, the trial court then determines whether the petitioner has made a prima facie showing he or she is entitled to relief. (*Ibid.*)

As the Supreme Court explained, "[w]hile the trial court may look at the record of conviction after the appointment of counsel to determine whether a petitioner has made a prima facie case for section 1170.95 relief, the prima facie inquiry under subdivision (c) is limited. Like the analogous prima facie inquiry in habeas corpus proceedings, ' "the court takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations

were proved. If so, the court must issue an order to show cause." ' [Citation.] '[A] court should not reject the petitioner's factual allegations on credibility grounds without first conducting an evidentiary hearing.' [Citation.] 'However, if the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' [Citation.]" (*Lewis, supra*, 11 Cal.5th at p. 971.)

Here, defendant filed a form petition that facially met the prerequisites for seeking relief under section 1170.95, subdivision (a)(1) through (3). Thereafter, the People argued in briefing and the trial court accepted, that defendant was ineligible because the jury had determined that defendant had personally discharged the firearm that proximately caused the murder victim's death and the great bodily injury victim's great bodily injury (§ 12022.53, subd. (d)). Premised upon these findings, the trial court concluded that the jury necessarily found defendant guilty of first degree murder and attempted murder without relying upon the natural and probable consequences doctrine, thus precluding relief. We agree.

Here, the jury determined that in the commission of the murder and attempted murder, defendant had personally "used, and intentionally discharged" a gun proximately causing both the death of the murder victim and the great bodily injury of the attempted murder victim (§ 12022.53, subd. (d)). Defendant argues these findings should not preclude his petition for relief because the jury instruction concerning this enhancement does not require either a finding of express or implied malice. As such, he reasons, it cannot establish that the jury convicted him on a theory of malice murder and/or attempted murder (§§ 664, 187, 188) without utilizing the natural and probable consequence doctrine. (See CALJIC No. 17.19.5; *Offley, supra*, 48 Cal.App.5th at p. 597-598 [true finding on § 12022.53, subd. (d) enhancement does not require either "an intent to kill" or "conscious disregard" for human life and as such does not establish *as a matter of law* that a defendant acted with malice aforethought for purposes of

9

murder].)  While there may be some initial appeal to this argument, it does not survive scrutiny.

Prior to the amendments of Senate Bill 1437, the natural and probable consequence doctrine was utilized to run *accomplice* liability for both the crime that an individual intended to aid and abet, as well as "any other offense committed that [was] the natural and probable consequence of the aided and abetted crime."  (*Gentile, supra*, 10 Cal.5th at pp. 838-839.)  Thus, it was a theory that could be utilized to extend liability for a victim's murder beyond the actual killer, to individuals who aided and abetted target offenses the natural and probable consequence of which was murder.  (*Ibid.*; *Offley, supra*, 48 Cal.App.5th at p. 595.)  The same was true of attempted murder.  (*People v. Miranda* (2011) 192 Cal.App.4th 398, 409-410.)

Here, the jury's findings that defendant intentionally fired the gun proximately causing the murder victim's death and attempted murder victim's great bodily injury, implicitly included a determination that defendant was the actual killer/attempted killer.  (See *People v. Cornelius* (2020) 44 Cal.App.5th 54, 58, abrogated on another point in *Lewis, supra*, 11 Cal.5th at pp. 961-962.)  As such, the jury did not utilize the natural and probable consequences theory to extend murder or attempted murder liability *from another individual* to defendant.  Rather, the jury determined defendant was the killer/attempted killer, and thus, guilty of the non-target offenses of first degree malice murder and attempted murder as the actual perpetrator.  Accordingly, Senate Bill 1437's changes to sections 188 and 189 are inapplicable to him as a matter of law.  (See *Cornelius*, at p. 58 [actual killer convicted of second degree murder ineligible for relief].)

10

DISPOSITION

The trial court's order denying defendant's section 1170.95 petition is affirmed.


_____\s\_____,
BLEASE, Acting P. J.


We concur:


_____\s\_____,
RENNER, J.


_____\s\_____,
KRAUSE, J.

11